IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 25, 2020

## STATE OF TENNESSEE v. DARIUS PATTERSON

**Appeal from the Criminal Court for Knox County**
**No. 113995      Bob McGee, Judge**

_____

### No. E2019-01173-CCA-R3-CD

_____

The defendant, Darius Patterson, appeals his Knox County Criminal Court jury convictions of especially aggravated kidnapping, possession with intent to sell or deliver .5 grams or more but less than 15 grams of heroin, possession with intent to sell or deliver 26 grams or more of cocaine, simple possession of marijuana, evading arrest, unlawful possession of a firearm by a convicted felon, and two counts of employing a firearm during the commission of a dangerous felony after having been previously convicted of a felony, challenging the sufficiency of the convicting evidence and the sentencing decision of the trial court. We discern no error in the proceedings below, and, as a result, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Mary Ward, Knoxville, Tennessee, for the appellant, Darius Patterson.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Charme P. Allen, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

        In case number 113005, the Knox County Grand Jury charged the defendant and the co-defendant, Lavan Johnson, with two alternative counts of especially aggravated kidnapping, two alternative counts of aggravated kidnapping, and one count of unlawful possession of a firearm by a convicted felon related to offenses committed against the

victim, Travis Clark.[1]  In case number 113995, the Knox County Grand Jury charged the defendant with one count of possession with intent to sell or deliver 26 grams or more of cocaine, one count of possession with intent to sell or deliver less than 15 grams of heroin, one count of simple possession of marijuana, one count of evading arrest, one count of unlawful possession of a firearm after having been previously convicted of a felony drug offense, one count of employing a firearm during the commission of the dangerous felony involving the possession with intent to sell or deliver cocaine, one count of employing a firearm during the commission of the dangerous felony involving the possession with intent to sell or deliver heroin, one count of employing a firearm during the commission of the dangerous felony involving the possession with intent to sell or deliver cocaine after having been previously convicted of a felony, and one count of employing a firearm during the commission of the dangerous felony involving the possession with intent to sell or deliver heroin after having been previously convicted of a felony.

At the defendant's October 2018 trial, Kimberly Cleek, a security guard for U.S. Security Incorporated at the Gerdau Ameristeel Plant on Tennessee Avenue in Knoxville, testified that on the morning of February 17, 2018, a man later identified as the victim "came to the window instead of the door and started, like, banging on the window and asking me to call 911."  The victim, whom she described as bleeding, disheveled, and frantic, asked her "to call his girlfriend and then tell her to get . . . the kids out of the house."  "He kept saying they were coming after him, they were going to get him, they were going to kill him, they were chasing him."  Because company policy prevented Ms. Cleek from treating the victim's injuries, or even allowing him to remain onsite, she told him to go back into the street, but he refused to move until she agreed to take his information and to call his girlfriend.  The victim refused to provide his name, but Ms. Cleek nevertheless called the number that he gave her and told the woman who answered "what he looked like, what he said."  When she finished that call, Ms. Cleek called 9-1-1.

In the meantime, the victim "continued down the street. . . . to the next house that was across the street from us, knocked on the door."  When no one answered, the victim "went down to the next house."  Although Ms. Cleek could not tell whether the victim had entered that house, she later saw the police and emergency personnel respond to it.  By that time, the victim was sitting on the curb.

Kari Harris, the victim's fiancée, testified that at the time of the offenses, she and the victim lived at 4804 Ball Camp Pike with Ms. Harris's 14-year-old son and "[a]nother boy named Dez" who was 19 years old.  Early on the morning of February 17, 2018, she and the victim awoke to someone knocking on the door of their house.  The

---

[1]    Following the consolidation of the two indictments for trial, the State dismissed the firearms charge in case number 113005.

victim "ran to the living room to see who was out front. He did not see nobody. He turned back around, and next thing we know, we heard the front door open and all the sudden, cussing and screaming and going on." The co-defendant, whom she knew as "Nephew, Blue, Lavan," had entered the house and was "screaming" "Where the f***'s my s***? I want my s***. Give me my f***ing s***." Ms. Harris said that she "was kind of scared," so she stayed in the bedroom. She recalled that the victim attempted to calm the co-defendant, but the co-defendant, who appeared to have a gun in his right pocket, "just kept walking back and forth, back and forth and back and forth." Eventually, the co-defendant then demanded that the victim come outside with him.

Ms. Harris testified that she heard the men walk outside and then heard "a loud roar, like a car taking off. So I ran to the door and I just see this car taking off and there went [the victim]." She called 9-1-1 to report what had happened. A short while later, the victim called her "hysterical, crying" and told her that he was "at Massachusetts" and that she should call 9-1-1. After the call ended, Ms. Harris drove "over that way, not knowing what I was going to do. I was just trying to get the address of where he was, being careful while I was at it." She was unable to get the exact address, "but I got the house a couple up." As she drove by the house on Massachusetts, Ms. Harris "noticed a vehicle sitting outside of that address that I'd never seen before. And it was a newer-type vehicle."

At some point, Ms. Harris called 9-1-1 and drove to the parking lot of a nearby church to wait. While Ms. Harris waited at the church, she received a call from the co-defendant, who said, "[Y]ou have ten f***ing minutes. I'm, like, what are you talking about? You have ten minutes to get me my s***. I'm, like, I don't know what you want. He's, like, you know what s*** I want." She said that the co-defendant warned her that "if you don't get it, you won't never see [the victim] again and he won't see your boys. I was really scared."

Ms. Harris testified that she saw "a car pass by and . . . noticed that it was . . . the nice car in front of that house. And I noticed that it was Lavan driving it." She said that she was going to follow the car but decided not to do so because she did not see the victim in the car and "got really, really scared." Ms. Harris identified a black Impala from a photograph as the nice car that she saw "sitting in front of Massachusetts house" and being driven by the co-defendant.

After seeing the black Impala drive by, Ms. Harris drove down Texas and saw two police officers. She waived the officers down and "told them what was going on." While she was speaking with the officers, Ms. Harris "got a phone call from a lady" and relayed the information she received to the officers.

Ms. Harris testified that both the defendant and the co-defendant had been to her house before and that the co-defendant had left his inoperable vehicle in their driveway. Two or three days before the offenses in this case, an incident occurred that prompted Ms. Harris to kick the defendant and the co-defendant out of the house. Ms. Harris later learned that the victim had taken $100 and some clothing from the co-defendant's vehicle on the same night as that incident.

During cross-examination, Ms. Harris claimed that the victim was able to call her after he left with the co-defendant because the co-defendant "ran out of the room real quick." Ms. Harris admitted that the co-defendant had given the victim $100 to "put it on somebody's books" and that the victim had instead spent the money on food, gas, and cigarettes. She said that she also recalled seeing the victim wearing a pair of Jordan shoes that she did not recognize. She acknowledged that, to the best of her knowledge, the victim did not have any money or property that belonged to the defendant.

The victim testified that he became addicted to opioids, that the addiction led him to begin using heroin after "[t]he pills got too expensive," and that he purchased heroin from the co-defendant. On February 17, 2018, he "heard a knock at my back door that comes into my bedroom," and when he got up to look outside, he saw the co-defendant "come around to the front of my house." The co-defendant entered through the unlocked front door "screaming, . . . who had been in his car, who got his clothes." The co-defendant saw "his shoes beside the couch." The victim acknowledged that he had gotten some clothes out of the co-defendant's car and said that he "went and got in the washer where his clothes was . . . and gave them back to him." The victim recalled that the co-defendant "said, man, if my clothes don't show up, if my stuff don't show up, everybody in this f***ing house is going to die." Ms. Harris responded, "[T]he hell? My MFing kid is here." The co-defendant then demanded that the victim go outside with him, and the victim refused. "And that's when he grabbed towards his waistband and said, come outside with me." The victim said that he saw "the handle of a gun" when the co-defendant grabbed at the waistband of his pants.

The victim testified that he agreed to go outside with the co-defendant because his stepson was in the house. The co-defendant then demanded that the victim "take a ride" with him, and they left. At one point, the victim "unlocked the door and started to get out and [the co-defendant] said, Bro, where you going? You're making me think that you done something." The co-defendant "grabbed ahold of his waist. So I . . . shut the door back." They drove through the Lonsdale community and eventually arrived at a house on Massachusetts. When the co-defendant got out of the car, the victim "had a split second to call" Ms. Harris to tell her where he was. When he got out of the car, the victim helped the co-defendant get some clothes out of the back of the car and carry them

-4-

into the house. Inside, they encountered the defendant. The co-defendant said, "Bro, Dog, they . . . stole my clothes." The defendant responded, "Where's Nephew's clothes?"

The victim testified that the two men then sat the victim "down at the doorway going out the living room into the hallway." The co-defendant went into a bedroom and returned with "an AR-15. And [the defendant] had, at this time -- I don't know if he had pulled it out of his waistband or what, but he had had a Glock 9 and was pointing it at me." The defendant asked the victim if he "was wearing a wire," "so I pulled up my shirt and pulled my basketball shorts down to show that I wasn't wearing a wire." According to the victim, the defendant said, "Let's just kill him here. And Lavan was, like, no, this ain't our house, not here. We'll take him somewhere else." The defendant then "punched me in my left side of my eye and told me to open my mouth and stuck the Glock in my mouth" and told the victim that if he "tried to fight back," the co-defendant would "blow my head off." The victim testified that the defendant bound his hands with an extension cord, and the co-defendant left "to go back to the hotel" to pick up "Junior," whose car the co-defendant was driving.

After the co-defendant left, the defendant "turned to his right and I rolled to my right and took off through the hallway and dove through the closed window and just took off running and never looked back." The victim said that he ended up at the steel plant, where he "[t]old the lady to call 911, and then I told her to call my fiancée and tell her . . . that I got away and to . . . get herself and the kids out of the house." The guard told him to get away from the guard shack, so he went to one house, where he was turned away, and then to another house, where the man inside agreed to call 9-1-1. Shortly thereafter, the police and an ambulance arrived. The victim did not go to the hospital but instead rode with Ms. Harris to the police station.

During cross-examination, the victim acknowledged that he had purchased heroin from the co-defendant "[p]robably six or seven times" in the few months that he had known the co-defendant, including on one occasion at the Massachusetts house. He said that he had not used heroin "for about a week" before the offenses because he had been "[d]etoxing . . . with Suboxone" that he purchased "[o]ff the street." He admitted that he had been avoiding the co-defendant because he "was trying to get myself clean" and because "he gave me $100 to go put on . . . Sparkle Jones' books that was in jail and I didn't." He said that he thought that the co-defendant "possibly could have been mad." The victim said that he did not see the gun in the co-defendant's waistband but only glimpsed the handle. He did not know what happened to that weapon.

The victim denied having purchased drugs from Samuel Craddock, the father of one of Ms. Harris's sons. He said that he was "pretty sure" that Mr. Craddock had purchased heroin from the co-defendant and that some of those purchases had happened at

the victim's residence. The victim also denied having purchased drugs from the co-defendant after the offenses. He acknowledged having seen the co-defendant at a gas station in the weeks before the trial but said that the two did not speak.

Avangelene Williams testified that on February 16, 2018, she and Odell Wright, whose nickname was Junior, met shortly before midnight and "went to The Ball," a gentleman's club, to hang out. After leaving The Ball, Ms. Williams and Mr. Wright went to the Motel 6 on Merchant's Drive, where they watched television for a few hours. She recalled that another black man, whom she described as "the younger guy," was also in the motel room with them. There were no white men in the motel room with them.

Ms. Williams testified that at that time, Mr. Wright drove a black or navy blue Impala that he had rented. She recalled that sometime between 6:00 a.m. and 7:00 a.m. on February 17, 2018, the younger guy took the rented Impala and "left about two hours. Then he came back and he was anxious. And then we all left. I needed to go home for my son." Ms. Williams said that the younger guy drove, Mr. Wright rode in the front passenger's seat, and Ms. Williams rode in the rear passenger's seat; there were no white men in the car. She believed the men were driving her "home to East Knoxville, but then we make a turn into Lonsdale." At that point, she noticed that the younger guy was "kind of anxious." He "ran a stop sign. And then we go to the dead end and he automatically g[o]t out. And then Junior switched to driving and I go into the passenger side." Shortly after they pulled out to go, they were stopped by the police. Ms. Williams said that at no point did either she or Mr. Wright walk a white man into a house in Lonsdale.

During cross-examination, Ms. Williams testified that the younger guy was already in the room at the Motel 6 when she and Mr. Wright arrived at approximately 4:00 a.m. She said that Mr. Wright never referred to the younger guy by name and that she would not recognize him if she saw him.

Knoxville Police Department ("KPD") Officer Francisco Vargas testified that he responded to a call of a kidnapping with a firearm. After speaking with Ms. Harris, Officer Vargas "initiated a traffic stop on a vehicle that she described the suspect driving." After speaking with Mr. Wright, who was driving the car, Officer Vargas went to a house at 1936 Massachusetts. As he walked to the front door of the house, he saw "the defendant in the backyard, closer to the alley." When the defendant turned and made eye contact with Officer Vargas, the defendant "took off up the alley . . . toward McClellan." Officer Vargas gave chase. Officer Vargas kept the defendant in sight as the defendant ran through the alley past several houses and onto McClellan. As they ran, Officer Vargas saw the defendant jettison several items: "He dropped cash throughout the alley, a toboggan. And when he got closer to McClellan, I observed him throw a clear baggie in the front yard of that residence." The defendant ran "almost back to Massachusetts on McClellan." After

the defendant was in custody, officers searched the defendant and found "a bag of powder cocaine" in his pocket. Officer Vargas retraced the route of the foot chase and found the bag that he had seen the defendant toss over a fence. It contained "more narcotics." Officer Vargas collected two baggies containing what he believed to be narcotics, one from the defendant's pocket that appeared to be "a bag of powder cocaine" and one from the area where he had seen the defendant toss a baggie over a fence that contained smaller baggies. Another officer discovered "a firearm" in the yard of a house along the same route.

KPD Officer Timothy Riddle, who investigated the kidnapping of the victim, testified that when he first encountered the victim, "you could obviously tell that he had been involved in a situation. He was bandaged up, . . . he was cut up. Looked like he had maybe jumped through a glass, like he said. He seemed very scared to me that particular day." He said that the victim "seemed pretty coherent" and did not appear to be "under the influence of anything." After speaking with the victim, Officer Riddle "could not get a definite address" where the victim had been taken but was able to get a description of the house from the victim. At that point, Officer Riddle, who was in an unmarked police car, "drove by the home" and "notified dispatch of the correct address." At that same time, he learned that officers had stopped "a black newer rental Chevy Impala" that matched the "description of the car that was given out as possible suspects." Officer Riddle arranged for the occupants of that car, Mr. Wright and Ms. Williams, to be transported to the police station, and then he drove to the police station to conduct witness interviews.

Officer Riddle interviewed the victim, Ms. Harris, Ms. Williams, and Mr. Wright before he interviewed the defendant. A video recording of the defendant's interview was played for the jury.

During the interview, the defendant said that "Odell," whom he also knew as "Junior," and the co-defendant, whom he knew as "Lavan" or "Blue," brought the victim, to whom he initially referred as "that white boy," into the house at Massachusetts. He said that, "when they pulled up, Junior and Blue was at the front, and the girl and the white boy was in the back." He said that he heard Blue threaten to kill the victim. He also claimed that Blue and Junior brought the "AR-15" and "a Glock 40" into the house. The defendant said that he left the house "for a little bit" and that, when he returned, "the window . . . was busted out," the victim was gone, and "Blue was mad." The defendant claimed that he saw Junior and the girl "pull[] off with" the white boy. The defendant denied any knowledge of "what they had going on" and initially claimed that he did not even know the victim. The defendant later admitted that he knew the victim, that the victim bought drugs at the Massachusetts house, and that he had gotten high with the victim before. He said that Blue had "fronted" heroin to the victim. He said that Blue "ran a lot of heroin and powder down here to us," that "Junior cooks the dope," and that they sold drugs out of the house at Massachusetts. The defendant claimed that he was responsible for bringing customers to

the Massachusetts house. The defendant admitted that the powder cocaine discovered in his pocket belonged to him and said that it was for his personal use. He acknowledged having thrown the baggie containing the other drugs but claimed that the second baggie belonged to Blue. The defendant said that the money seized from him was his and that it had been given to him by Blue in exchange for bringing in customers. He said that Junior and "his daddy" were at "the top of the food chain" of drug dealers in Knoxville. The defendant denied ownership of the Glock, claiming that the only reason he had the gun when the foot chase commenced was because Blue had told him to take it.

Officer Riddle testified that the defendant claimed to be high during the interview but stated that he did not believe the defendant to be under the influence. He conceded that "it's the first time I've met the young man. So he seemed normal to me." When asked about the defendant's whispering throughout the bulk of the interview, Officer Riddle opined, "First of all, he knows the interview's being recorded, so he wants to speak very softly so you can't hear him. Second of all, there was another young man in the hallway, and he didn't want that young man to know . . . what he's telling . . . ."

As the investigation progressed, Officer Riddle interviewed Ms. Cleek and confirmed that a 9-1-1 call was placed from the steel plant. He also spoke with the gentleman who called 9-1-1 after the victim arrived at the gentleman's home. Officer Riddle photographed blood on the door of that gentleman's home. These interviews, along with the 9-1-1 recordings, corroborated the victim's account of the events.

KPD Officer Phillip Jinks, who testified as an expert in narcotics investigations, conducted a search of the house at 1936 Massachusetts. He said that as he spoke to the resident of the home, Amanda Henderson, he "observed a small bag of marijuana on the table. That was just inside the door." Ms. Henderson ultimately claimed ownership of the marijuana. Inside the house, he observed "an AR-15-style rifle laying there on the floor" with "the magazine above it and . . . a loose round of .223 ammunition laying above it." He found "a metal cake pan with a white bottle on top of it. That was an Inositol powder bottle." He explained that "Inositol is a dietary supplement that's frequently used in the manufacturing process for various controlled substances" and as "a cutting agent or a cut in cocaine. It's also used in the manufacture and preparation of heroin for distribution." The metal cake pan had "kind of a brownish powder in the bottom of it." A "sifter" and some "plastic cards like hotel room keycards or credit card-type cards" found nearby "had that same residue on" them. "There were also particulate masks in that cake pan as well. That's usually seen in the preparation of heroin and fentanyl, to prevent the person who's mixing it from inhaling those substances." He found "a plastic bag . . . with loose rifle ammunition in it" and "a drum or double-drum magazine . . . that was loaded with ammunition." "There is a digital scale with the cover off of it there with some residue on it." Digital scales, he said, "are commonly and frequently used in the distribution of

controlled substances." In a bedroom, Officer Jinks found a "Pyrex-brand measuring glass. And the reason that's significant is it had a powder substance in it that was consistent with cocaine." He said that "[t]he most frequent way that I've seen for manufacturers to cook or make crack cocaine is . . . in Pyrex measuring glasses."

Officer Jinks identified a photograph of a jacket with "a corner baggie containing white powder" in the pocket. He also identified "a bag containing numerous smaller bags" called "stamp baggies," which he said were "very small Ziploc-style bags" that were "frequently used in heroin distribution, cocaine distribution sometimes." Officers ultimately found four sets of digital scales inside the house, which he described as "telling" because that number of scales was "not something that we typically see in houses where controlled substances are not being prepared for distribution." He said that, in his expert opinion, the amounts of the various narcotics in the baggie discarded by the defendant, along with the other evidence, indicated that "these items were being processed for resale."

Officers seized a cellular telephone from the defendant. Forensic examination of that telephone uncovered text messages that indicated that the defendant had been staying at 1936 Massachusetts and that he had been selling narcotics from that location. The cellular telephone also contained numerous photographs, including one of the defendant and the co-defendant taken inside the residence at 1936 Massachusetts. The photograph was also displayed "on a Facebook page named Darius Stackz" that was accompanied by the comment "Trap b****es." In the photograph, the defendant is "flipping through a quantity of money" while the co-defendant stands with "a quantity of money in his hand and what appears to be a pistol with an extended magazine in his right front pants pocket." Officer Jinks explained that "[a] trap is a location where drugs are being sold. A trap house is a house where drugs are being sold. Trapping is selling drugs."

A quantity of money was seized from the defendant's person, and more was discovered along the route of the foot chase. The total amount of cash seized was $740, consisting mostly of $20 bills, which denomination was, according to Officer Jinks, "the most common currency used to purchase controlled substances" generally and crack cocaine specifically. Utilizing his knowledge of the street value of the various controlled substances, Officer Jinks concluded that the amount of crack cocaine seized would have been worth "in the neighborhood of $800." The 2.3 grams of heroin, "if sold by the gram, that's almost $500 worth of heroin." He said that the 25 grams of powder cocaine tested by the TBI would have been worth $50 per gram if sold as powder cocaine and added that "[t]here was an additional 7.69 grams of powder, as well, that was not tested." He estimated that the 25 grams of cocaine was worth "somewhere in the neighborhood of $1,200" as powder cocaine. Officer Jinks testified that "the important thing to note about powder cocaine in this case is that with all the . . . paraphernalia for manufacture of crack cocaine, . . . it would be my opinion that that powder cocaine was going to be cooked into

crack cocaine" in order to "increase the quantity." The 25 grams of powder cocaine, if cooked into crack cocaine, "even if you stay consistent with that weight at 25 grams, and you sell that at $100 a gram, then that's $2,500. You double your money if you cook into crack, if sold as rocks."

Tennessee Bureau of Investigation ("TBI") Special Agent and Forensic Scientist Carolyne Simpson testified as an expert in the field of forensic chemistry and drug identification. Agent Simpson analyzed the controlled substances seized in this case. Upon opening the package obtained from the KPD, she "saw that there was an 'orange powder'" along with "multiple white powders, off-white, rock-like substance and plant material inside the case." The "orange powder" substance weighed 2.37 grams and contained heroin, fentanyl, and cocaine. The "white powder" was 25.02 grams of cocaine. The "off-white, rock-like substance" was 8.20 grams of cocaine base. Another baggie of "fine white powder" did not contain any controlled substances. The "plant material" was .51 grams of marijuana.

Samuel Douglas Craddock, the father of Ms. Harris's son, testified on behalf of the defendant that he had seen the co-defendant at the victim's house "[a]bout a half a dozen times" in the six weeks prior to the trial. He said that he was surprised to see the co-defendant at the house given the allegations against him. He said that the co-defendant and the victim "were just acting like normal. Nothing happened."

During cross-examination, Mr. Craddock said that the defendant "used to live there" with the victim. He admitted that he had spoken to the co-defendant the day before he appeared as a witness and that he had told the co-defendant he would be testifying on behalf of the defendant. He said that he was not concerned about the co-defendant's being present in the home with his son "because I never seen him do anything wrong."

Based upon this evidence, in case number 113005, the jury convicted the defendant as charged of especially aggravated kidnapping in count one, the lesser included offense of aggravated kidnapping in count two, as charged of aggravated kidnapping in count three, and the lesser included offense of kidnapping in count four. The trial court merged all of the convictions into a single conviction of especially aggravated kidnapping and, following a sentencing hearing, imposed an effective sentence of 30 years' incarceration to be served at 100 percent by operation of law.

In case number 113995, the jury convicted the defendant as charged in all counts. The trial court merged the defendant's conviction of employing a firearm during the commission of the dangerous felony involving the possession with intent to sell or deliver cocaine into his conviction of employing a firearm during the commission of the dangerous felony involving the possession with intent to sell or deliver cocaine after having

been previously convicted of a felony. The court also merged the conviction of employing a firearm during the commission of the dangerous felony involving the possession with intent to sell or deliver heroin into the conviction of employing a firearm during the commission of the dangerous felony involving the possession with intent to sell or deliver heroin after having been previously convicted of a felony. Following a sentencing hearing, the trial court imposed sentences of 15 years each for the convictions of possession with intent to sell or deliver cocaine and possession with intent to sell or deliver heroin and ordered that they be served concurrently to each other. The court imposed sentences of 10 years for each of the convictions of employing a firearm during the commission of a dangerous felony and ordered that they be served concurrently to each other but consecutively to the predicate felonies for each conviction. Additionally, the court ordered 100 percent service of the 10-year sentence imposed for those convictions as required by operation of law. The court aligned the 10-year effective sentence for the defendant's firearms convictions consecutively to the 30-year effective sentence in case number 113005. The total effective sentence is, therefore, 40 years at 100 percent release eligibility percentage.[2]

---

[2]   In what appears to be part of a somewhat disconcerting trend, the State chose to make into four counts a single instance of kidnapping, which is a continuing offense. Additionally, the State charged three drug offenses and two firearms offenses as a nine-count indictment. The improper charging of the same offense in more than one count of an indictment results in multiplicity, the evils of which "are two-fold." "[M]ultiplicity may carry the potential of unfair prejudice, such as suggesting to the jury that a defendant is a multiple offender or falsely bolstering the state's proof on such issues as the defendant's motive or knowledge of wrongdoing" and "can lead to multiple convictions and punishment for only one offense." *State v. Whitmore*, No. 03C01-9404-CR-00141, 1997 WL 334904, at *9 (Tenn. Crim. App., Jackson, June 19, 1997) (citing *State v. Desirey*, 909 S.W.2d 20, 27 (Tenn. Crim. App. 1995) (citations omitted)). The second problem, the potential for multiple punishments, can be cured by a merger of offenses. As to the first problem, however, even though "multiplicitousness never places a defendant in jeopardy of multiple sentences, the prolix pleading may have some psychological effect upon a jury by suggesting to it that defendant has committed not one but several crimes." *United States v. Mamber*, 127 F. Supp. 925, 927 (D. Mass. 1955); *see also, e.g.*, *United States v. Sue*, 586 F.2d 70, 71-72 (8th Cir. 1978). We can fathom no legal reason that compels the decision to break apart the offenses in this way. Indeed, Code section 40-13-202 requires that an indictment "state the facts constituting the offense in ordinary and concise language, *without prolixity or repetition*, in a manner so as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court . . . to pronounce the proper judgment." T.C.A. § 40-13-202 (emphasis added). Of particular concern in this case, the two charges of aggravated kidnapping were actually lesser included offenses of the two charges of especially aggravated kidnapping and, as such, need not have been pleaded separately because they were, by definition, included within the greater charge. We also observe that excessive multiplicity, even when it does not violate double jeopardy principles or unfairly prejudice the defendant, increases the potential for error and juror confusion and unnecessarily consumes valuable judicial time and resources. Even the trial court was confused about the multiple charges in this case, as evidenced by the discussion of the charges following the defendant's motion for a judgment of acquittal. The court noted that, even after two readings, it "still misread" the indictment. Further confusion was apparent at the sentencing hearing, where the trial court had difficulty discerning which of the myriad charges were to be merged. Even the prosecutor appeared confused at one point as to which convictions should be merged. As a result of the multiplicitous indictment in this case,

## I. Sufficiency

The defendant contends that the evidence was insufficient to support his convictions. Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

### Especially Aggravated Kidnapping

The defendant contends that the State failed to establish that he actively participated in the co-defendant's kidnapping the victim, arguing that the evidence actually showed that the defendant "did nothing to prevent [the victim] from leaving the residence despite the fact that he had a gun." The defendant also argues that the victim's testimony was not credible.

As charged in this case, "[e]specially aggravated kidnapping is false imprisonment, as defined in § 39-13-302 . . . [a]ccomplished with a deadly weapon." T.C.A. § 39-13-305(a)(1). "Aggravated kidnapping is false imprisonment, as defined in § 39-13-302, committed [w]here the victim suffers bodily injury." *Id.* § 39-13-304(a)(4). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* § 39-13-302(a).

The evidence established that the co-defendant forced the victim from his home and drove him to the house on Massachusetts, where the defendant was inside. Inside the house, the defendant held the victim at gunpoint and bound his hands with an extension cord. After the victim got away and led the police to the house, the defendant fled and,

---

the judgment forms alone consume 28-pages of the record—two pages for each of the 14 counts. The evidence against the defendant was clear and overwhelming, and the prolix indictment introduced unnecessary complexity into an otherwise straightforward case. Multiplicity should not be the goal but, instead, should be avoided whenever possible.

during his flight, discarded a handgun matching that described by the victim. That the victim was able to escape is irrelevant to a determination whether he had been removed or confined against his will in the first instance. Moreover, we decline the defendant's invitation to revisit the victim's credibility, an issue solely within the purview of the jury.

*Possession with Intent to Sell or Deliver Cocaine and Heroin*

The defendant asserts that the evidence was insufficient to support his convictions for possession with intent to sell or deliver cocaine and heroin, arguing that the absence of the defendant's fingerprints and the fact that multiple people had access to the house on Massachusetts undercut the State's theory that he was selling drugs out of that house. Additionally, he asserts that neither the large amount of cash nor the similarly large amount of drugs in his possession supported a conclusion that he possessed the drugs with the intent to sell or deliver them. Finally, he claims that Office Jinks was essentially "a professional witness by the State who was biased."

"It is an offense for a defendant to knowingly . . . [p]ossess a controlled substance with intent to . . . deliver or sell the controlled substance." *Id.* § 39-17-417(a)(4). "It may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing. . . ." *Id.* § 39-17-419.

Here, the defendant was arrested following a foot chase, during which he discarded a bag containing large amounts of heroin, powder cocaine, and crack cocaine. More powder cocaine was discovered on the defendant's person. The house from which the defendant fled was littered with indicia of drug manufacture and sales. The police found several sets of digital scales, hundreds of baggies of varying sizes, and cookware that bore the signs of having been used to cook powder cocaine into crack cocaine. The defendant, who had no job and no other source of income, had $740 in cash at the time of his arrest. In our view, this evidence was more than sufficient to support the defendant's convictions.

*II. Sentencing*

The defendant also challenges the sentencing decision of the trial court, arguing that the trial court erred in the application of certain enhancement factors and erred by concluding that the enhancement factors outweighed the mitigating factors.

Our supreme court has adopted an abuse-of-discretion standard of review for sentencing and has prescribed "a presumption of reasonableness to within-range sentencing

decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise* 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). The abuse-of-discretion standard of review and the presumption of reasonableness also applies to "questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). The standard of review adopted in *Bise* "applies similarly" to the imposition of consecutive sentences, "giving deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013).

We need not tarry long over the defendant's claim because, even assuming that the trial court misapplied the enhancement factors in this case, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. Nothing in the record suggests that the trial court in this case "wholly departed from" the Sentencing Act. To the contrary, the record reflects that the trial court considered all the relevant principles when imposing the sentences in this case. Additionally, "[a] trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion," *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008), and this court is not free to reevaluate the weight and value assigned to the factors found by the trial court.

*Conclusion*

Accordingly, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE

-14-